1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                ---o0o---

4

5  RUTH WILLIAMS; ELAINE MCMASTER;

6  VARICK DAWSON; CHARLES R.

7  CHEROLIS and GORDON HOMINICK,

8        Plaintiffs,

9   vs.            No. 3:04-CV-1810 MMC

10  AGILENT TECHNOLOGIES; and DOES 1

11  Through 200, inclusive,

12        Defendants.

13  _____/

14

15

16       DEPOSITION OF STACIE DRUCKER-ANDRESS

17          THURSDAY, NOVEMBER 4, 2004

18

19

20

21

22

23

24

25  PAGES 1 - 282

1
EASTWOOD-STEIN DEPOSITION SERVICES
(800) 219-5300

1  you could see time frames.

2    Q    Well, how much is the time frame per day that

3  these employees spent?

4    A    I don't remember specifically. I'd have to

5  go back and look at each person specifically. I don't

6  have that in my memory bank.

7    Q    Did anybody ever state that it was two

8  minutes a day or eight minutes a day?

9    A    I don't remember.

10    Q    All right. But I take it that the content

11  was the reason for the termination, not the time amount

12  of computer use, correct?

13         MS. EISEN:  It misstates the testimony, vague

14  and ambiguous.

15         THE WITNESS:  It's more than just the content.

16  BY MR. CATALANO:

17  Q  What is more than the content? Let's

18  eliminate the content. Why else were they terminated

19  other than the content?

20  A  Well, content is probably the main reason.

21  Q  What was the secondary reason other than the

22  content, eliminate content?

23  A  The main reason for what?

24  Q  What reasons were they terminated other than

25  the content?

1      So each business group within Agilent has a

2  management team?

3      MS. EISEN: The question is vague and

4  ambiguous.

5      THE WITNESS: Yeah. I --

6      MS. EISEN: At least one.

7  BY MR. CATALANO:

8  Q  Each business group has a management team

9  within it, correct?

10   A   Yes.  There may be several, yes.

11   Q   But those management teams have to approve

12  terminations within that business group; is that

13  correct?

14       MS. EISEN:  The question is vague and

15  ambiguous.

16       THE WITNESS:  For that employee, the management

17  team in that business, yes, they make the decision as

18  far as termination.

19  BY MR. CATALANO:

20   Q   All right.  Do you know whether the

21  management team has to report to someone higher than the

22  team itself before making a decision like that, or is it

23  in the sole discretion of the management team?

24   A   When you say termination, do you mean an

25  involuntary termination --

1        THE WITNESS:  Let's clarify.  When you say "an

2  involuntary termination" -- let's clarify that point --

3  are you talking about a misconduct case? What?

4  BY MR. CATALANO:

5  Q   Here is the guidelines for involuntary

6  termination, correct? What is that exhibit? Which

7  exhibit is that, the involuntary terminations?

8  A   3.

9  Q   Exhibit 3 contains the description of

10  involuntary terminations, correct?

11  A   Right.

12  Q   And the terminations in this case of Varick

13  Dawson and Gordon Hominick were involuntary

14  terminations, correct?

15  A   M-hm.

16  Q   Yes? Is it yes?

17  A   They are involuntary terminations, yes.

18  Q   For involuntary terminations, whose approval

19  is needed?

20  A   It says right here in 2.3. It's the

21  management team, but it says, "Involuntary terminations

22  must have the approval of the entity" -- that means that

23  business -- "human resource manager and the general

24  manager." General manager, we also refer to as a VP or

25  vice president.

1   Q   Who was the VP that reviews those?

2   A   There is different ones for different

3   business.

4   Q   So the general manager is the general manager

5   of each business?

6   A   Right.

7   Q   That's the vice president?

8   A   Right.

9   Q   Who is it for your group?

10   A   For my group?

11   Q   Yes.  For these terminations, who was the VP?

12   A   Well, I'm in a whole different group than

13   these people.  I don't report into the same business

14   group as Gordon used to.

15   Q   Well, why were you involved then?

16   A   Because I'm a human resource person, but I

17   report into a different structure.

18   Q   Who would be the vice president that was in

19  charge of the termination of Mr. Hominick?

20   A   There were several different business groups.

21  So I'm trying to remember who his vice president was,

22  and that's what I'm not remembering.

23   Q   Is there only one vice president --

24   A   We've had a lot of changes.

25   Q   Is there only one vice president for each

1  business group?

2   A   Yes.

3   Q   So whoever that was --

4   A   Yes.  I'm sorry.  I can't recall who it was.

5   Q   That's fine.

6      Now, with respect to this time period of

7  February 2003, was it your understanding that at that

8  time period, Agilent was outsourcing certain jobs to

9  foreign countries?

10      MS. EISEN:  The question lacks foundation,

11  calls for speculation.

12  BY MR. CATALANO:

13  Q  You can answer.

14  A  Is it my understanding?

15  Q  Yes.

16     You are in human resources, which includes

17  hiring and reductions in force and that type of thing,

18  are you not?

19  A  M-hm.

20  Q  Is that true?

21  A  Parts of it.  It's not --

22  Q  Did you know that in February 2003, Agilent

23  was outsourcing certain jobs that were contained in

24  their facilities in the United States?

25     MS. EISEN:  The question assumes facts, lacks

1  STATE OF CALIFORNIA            ) ss.

2  CITY AND COUNTY OF SAN FRANCISCO  )

3

4     I hereby certify that the witness in the foregoing

5  deposition, STACIE DRUCKER-ANDRESS, was by me duly sworn

6  to testify to the truth, the whole truth and nothing but

7  the truth, in the within-entitled cause; that said

8  deposition was taken at the time and place herein named;

9  that the deposition is a true record of the witness's

10  testimony as reported by me, a duly Certified Shorthand

11  Reporter and a disinterested person, and was thereafter

12  transcribed into typewriting by computer.

13     I further certify that I am not interested in the

14  outcome of the said action, nor connected with, nor

15  related to, any of the parties in said action, nor to

16  their respective counsel.

17     IN WITNESS WHEREOF, I have hereunto set my hand and

18  affixed my signature this 17th day of November, 2004.

19

20     _____

21       JOANNE BALBONI, C.S.R. 10206

22

23

24

25